# JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT is made and entered into, effective this 29th day of February, 2000, by and between the following Parties:

| PARTY | PRINCIPAL PLACE OF BUSINESS | PLACE OF INCORPORATION |
|---|---|---|
| Peck/Jones Construction Corporation (hereinafter: Peck/Jones) | 10866 Wilshire Blvd., Suite 700 Los Angeles, CA 90013 | Los Angeles, California |
| Obayashi Corporation (hereinafter: Obayashi) | 420 East 3rd Street, Suite 600 Los Angeles, CA 90013 | Tokyo, Japan |

## WITNESSETH:

WHEREAS, the Parties are interested in performing pre-construction services, and in obtaining a contract from Cedars Sinai Medical Center, a California non-profit corporation (the "Owner") for the construction of a project known as CEDARS SINAI MEDICAL CENTER, DIAGNOSTIC AND TREATMENT CENTER, located in Los Angeles, California, (the "Project") the construction of the Project hereinafter called the Work ("Work") and the said Contract being hereinafter called the Contract ("Contract"); and

WHEREAS, the Parties hereto have agreed to form a Joint Venture which will perform pre-construction services and seek to obtain the Contract from the Owner; and

WHEREAS, the Parties hereto desire to set forth their rights and interests in the Joint Venture, and to set forth their duties and obligations under the Contract that may be awarded as a result of the bid;

NOW THEREFORE, in consideration of the premises, mutual promises and agreements herein set forth, the Parties hereby agree to constitute themselves as a Joint Venture for the purpose of performing pre-construction services and a G-Max proposal to the Owner for the performance of the Contract and for the purpose of performing and completing the construction of the Project in the event that the Contract is awarded to them, but not for any other purposes. This Agreement contemplates only the furnishing and performance of the work, labor and materials necessary for pre-construction services and for the completion of the Contract, and the Parties are not making any permanent agreement to develop or undertake any project other than this Project.

Nothing in this Agreement shall be construed as a limitation of the power or rights of either Party hereto to carry on its separate business for its sole benefit except, however, the Parties hereto shall cooperate with each other according to the terms and spirit hereof in the performance and completion of the Contract pursuant to this Agreement. The Parties hereby agree that such joint proposals shall be filed and such Contract, if awarded to them, shall be performed and completed by them as a Joint Venture subject to the following terms and conditions:

## PARAGRAPH 1: NAME OF THE JOINT VENTURE

The name of the Joint Venture shall be: "Peck/Jones-Obayashi, a Joint Venture," and the business of the Joint Venture shall be carried out under that name and under no other name.

## PARAGRAPH 2: BID

a) The Parties hereto agree to jointly prepare and submit a proposal for pre-construction services and for the construction of the Project under the Request for Proposal documents. Should the Parties fail to unanimously agree as to the form, terms, or conditions of the proposal and contract, then, in such event, the Joint Venture and this Agreement shall terminate, subject to the rights and obligations of the Parties accrued prior to such termination. Notwithstanding the foregoing, the Parties agree to exercise their commercially reasonable efforts and to proceed reasonably and with due diligence to agree to the form and the terms and conditions of the proposal.

b) Any negotiations with the Owner or any sureties, subsequent to the submission of the proposals, prior to the award of the Contract, shall be conducted by the Executive Committee as defined later herein.

c) Except as is provided in this Agreement, during the term of this Agreement, neither of the Parties shall, without the previous written consent of the other Party, which consent may be withheld in such Party's sole discretion, directly or indirectly propose for or take any interest for its own benefit in the execution or carrying out of the construction of the Project or any part thereof or any services preparatory thereto and each of the Parties shall do all in its power to ensure the observance of this prohibition by all persons in its employment and all of its affiliates and subsidiaries or parent company as defined by Federal or State law.

d) Except as otherwise provided to the contrary, or unless otherwise mutually agreed upon by the Parties hereto:

   Each of the Parties hereto shall assume its own expenses incurred prior to submission of the proposal; and

   ii) no payment shall be made by the Joint Venture to any Party or to any third-party in reimbursement of expenses incurred by such Party in connection with the preparation of the proposal.

e) If the proposal is accepted by the Owner, or if the Parties are successful in negotiating the Contract subsequent to the submission of the proposal, the Parties shall, in accordance with the direction of the Executive Committee, execute the Contract, and shall take such other steps as may be required to make the Contract a legal and binding agreement between the Parties and the Owner. If the proposal is not accepted by the Owner or if the Parties are not successful in negotiating the Contract with the Owner within nine months of submission of the proposal, then this Agreement shall terminate, subject to the rights and obligations of the Parties accrued prior to such termination.

## PARAGRAPH 3: PARTICIPATION OF PARTIES

a) Except as may be provided to the contrary in this Agreement, the interests of the Parties in any profits, and their respective shares in any losses and liabilities that may result from the performance of the Contract, and their interests in all property, equipment and other assets acquired by the Joint Venture, and all monies received in connection with the performance of the Contract shall be as follows:

| PARTY | PARTIES PROPORTIONATE SHARE |
|-------|------------------------------|
| Peck/Jones | 55 % |
| Obayashi | 45 % |

( The percentage stated above for each Party is hereinafter called its "Proportionate Share".)

b) Each of the Parties hereto agrees that in the event of any losses arising out of, or resulting from the submission of the proposal (except those expenses incurred by any Party in connection with the preparation of the proposal) and/or the performance of the Contract, each Party hereto shall assume and pay its Proportionate Share of such losses. If for any reason either of the Parties hereto incurs any liabilities or is required to pay any losses arising out of or resulting from the submission of the bid (except those expenses incurred by either Party in connection with the preparation of the bid) and/or performance of the Contract, or the posting or furnishing of the necessary performance or payment bonds, or payment under the terms of such bonds, which are in excess of its Proportionate Share, the other Party shall reimburse such Party in such amount or amounts as the losses or expenses and/or liabilities assumed or incurred by such Party exceed its Proportionate Share in the total losses, expenses and liabilities of the Joint Venture, so that each member of the Joint Venture will have then paid its Proportionate Share of such losses. To that end, each of the Parties hereto agrees to indemnify the other against, and to hold the other harmless from, any and all losses, expenses and liabilities of the Joint Venture that are in excess of the other's Proportionate Share, provided, however, that the provisions of this sub-paragraph shall be limited to losses, expenses and liabilities resulting from or arising out of the submission of the proposal and/or the performance of said Contract, the posting or furnishing of the necessary performance bonds, and payment under the terms of such bonds, and shall not relate to or include any incidental, indirect or consequential loss or losses, expenses or liabilities (including, without limitation, loss of profit, contract, use or revenue) that may be sustained, suffered, assumed or incurred by either of the Parties hereto in connection with the submission of the bid and/or performance of the Contract.

c) Peck/Jones agrees to place at the disposal of the Joint Venture the benefit of all its experience, technical knowledge and skill and shall in all respects bear the responsibility of completing the Contract, including the provision of information, advice and assistance for the execution of the Work. Obayashi shall provide such staffing for the Project as shall be agreed to between it and the Executive Committee.

## PARAGRAPH 4: EXECUTIVE COMMITTEE

a) To facilitate the handling of any and all matters and questions in connection with the submission of the proposal, negotiations with the Owner or any sureties, or the performance of the Contract, a Joint Venture Executive Committee shall be established comprised of one representative from each of the Parties hereto. Each of the Parties hereby appoints the following representative and alternate to act for it in all such matters with full and complete authority to act on its behalf in relation to any and all matters in connection with, arising out of, or in relation to any and all matters and questions involving the submission of the proposal, negotiations with the Owner or any sureties, or the performance of the Contract.

| PARTY | REPRESENTATIVE, ALTERNATE |
|---|---|
| Peck/Jones | Dan A. Penn, William S. Driver |
| Obayashi | Ralph W. Man, Don Osborne |

Any Party may at any time and from time to time change its appointed representative or alternate by filing with the other Party a written notice in accordance with Paragraph 22. The alternate representative shall serve only when the primary representative is absent or unable to serve.

b) The representatives of the Parties constituting the Joint Venture Executive Committee, who are designated in accordance with this Agreement, shall hereafter be known as the Executive Committee and shall meet from time to time as required or as requested by any member of the Executive Committee, subject to five (5) days' notice (or such lesser period upon which the members of the Executive Committee may agree), to act on matters within the mandate of the Executive Committee. Such meetings shall be in person or by telephone conference. A resolution in writing, signed by both members of the Executive Committee shall be as valid as if it had been passed at a meeting of the Executive Committee.

c) Decisions shall be taken by resolution with each of the representatives of each Party having an equal vote. All decisions of the Executive Committee shall be unanimous. Notwithstanding any other provision hereof, the following matters shall be determined by decision of the Executive Committee:

i) the amount and terms of the proposal, as specified in paragraph 2 (a);

ii) negotiations with the Owner or any sureties;

iii) a major expansion of the scope or schedule of the Work;

iv) alteration to this Joint Venture Agreement;

v) borrowing or financing in the name of the Joint Venture;

vi) acquisition or disposition of the plant, equipment, tools or salvageable materials of the Joint Venture;

vii) appointment and replacement of key personnel;

viii) any disputes with Owner;

ix) any disputes with a subcontractor in excess of $10,000;

x) change of bank accounts or bank procedures;

xi) all matters relating to licensing and alleged violations of the licensing laws;

xii) reserves for warranties;

xiii) distribution to the Parties, including, without limitation, distributions under Paragraph 14(a) of the Agreement;

xiv) terms and conditions of any payment to a Party, its affiliates or their employees;

xv) selection and negotiation of subcontracts and vendor agreements and change orders thereto;

xvi) preparation, filing, litigation, and resolution of claims filed by the Joint Venture or filed by third persons or entities against the Joint Venture;

xvii) employment of legal, accounting and insurance representatives for the Joint Venture;

xviii) termination of any contract entered into by the Joint Venture;

xix) other major decisions not involving day-to-day operations.

In case the Executive Committee fails to reach a unanimous decision the matter in question may at the election of either Party hereto be referred to the Senior Officer (Obayashi – Takayuki Fujisawa and Peck/Jones – Greg Jones) of each of the Parties for resolution.

d) Every decision of the Executive Committee upon any of the matters within its mandate under this Agreement shall be binding upon the Parties.

e) If neither the representative of a Party nor his alternate attends a duly convened meeting of the Executive Committee, the meeting shall be adjourned and requested again giving notice as required. Should neither the representative of a Party nor his alternate still not attend, then the meeting shall proceed in their absence.

f) The Executive Committee shall have the mandate to deal with all decisions, commitments, agreements, understandings and all other matters pertaining to negotiations with the Owner or any sureties subsequent to the submission of the bid and pertaining to performance of the Contract. The Executive Committee shall have power and authority:

   i) To supervise and control the performance of the Managing Party later defined herein;

   ii) To exercise control and make decisions on general policy matters related to the Joint Venture which are not specifically delegated to the Managing Party, or the Project Manager;

   iii) To review and approve the Managing Party's recommendations on such matters as the overall plan for execution of the Work, determination of the amount of working capital required, the timing of calls for working capital contributions, the determination of requirements and plans for the acquisition of any plant, equipment or major material items, the approval of salary schedules, the return of working capital advanced by the Parties to the Joint Venture and the distribution of profits earned;

   iv) To delegate the authority to act for and bind the Parties to this Agreement in connection with all or any part of the performance of the Work. Said delegation of authority to either one of the Parties, or to any other person or persons may be revoked at any time;

   v) To receive and review reports on the progress of the Work from the Managing Party. The Project Manager shall meet with the Executive Committee when requested by said Committee. The contents and timing of the reports will be generally as outlined in Exhibit 1 attached hereto;

   vi) To determine the amount of any reserves required for any warranty period in respect of any unsettled claims demands or other contingencies of the Joint Venture relating to the Work; and

g) The Executive Committee shall establish the following subcommittees with representatives from both Parties, which will assist the Executive Committee:

i) **Accounting Subcommittee**
The Accounting Subcommittee shall provide for accounting coordination between the Project and the respective Parties. Because of the level of detail involved in accounting issues, the Parties believe this function can be best handled at a subcommittee level between their respective representatives. This subcommittee shall review policies and procedures with regard to Project accounting, such as the necessary invoice and vouchers for issuing payments. It shall also invest available excess cash. The accounting subcommittee shall explore, and if possible implement, a Joint Venture reporting system that permits Peck/Jones to use their normal monthly report. The Accounting Subcommittee shall keep itself fully apprised at all times of available cash and cash requirements so that the need for working capital can be projected at least 60 days in advance.

ii) **Jobsite Joint Venture Subcommittee**
The second subcommittee shall be the Jobsite Joint Venture Subcommittee, which subcommittee shall communicate on regular basis, daily or weekly, as necessary or appropriate, with key jobsite personnel.

iii) **Purchasing Subcommittee**
The Purchasing Subcommittee shall make recommendations to the Executive Committee regarding purchasing decisions.

h) All business transacted at meetings of the Executive Committee shall be recorded in suitable minutes by the Managing Party and distributed to all Parties hereto for comment, correction and acceptance within two weeks.

i) Neither Party can bind the other Party except in accordance with the express authority granted in this Agreement. A Party is not an agent for the other Party for any purposes, whether related or unrelated to the business of the Joint Venture.

## PARAGRAPH 5: MANAGING PARTY

a) Peck/Jones is hereby designated as the Managing Party of the Joint Venture. The Managing Party shall have responsibility for and supervision over the timely and satisfactory performance of the Contract, subject, however, to the superior authority and control of the Executive Committee as set forth in Paragraph 4.

b) The Managing Party shall have authority to appoint and replace from time to time the various salaried and hourly personnel necessary to develop and operate the Work, and to negotiate, execute and deliver purchase orders, rental agreements, labor agreements, subcontracts and such other agreements as are necessary and appropriate to carry out the Contract. The Managing Party shall not consent to any major expansion of the scope of the Work without the approval of the Executive Committee.

c) The Managing Party shall be responsible for establishing a project office at the jobsite and conducting all business affairs on behalf of the Joint Venture including but not limited to payment of Joint Venture accounts, furnishing statements and reports concerning the financial status of the Joint Venture and progress of the Work as required by the Executive Committee. The Managing Party shall furnish each of the Parties with a monthly cost report and a monthly financial statement calculated on the percent of completion basis.

d) The Managing Party's responsibilities are further delineated in Exhibit 2 attached to this agreement.

e) Other off-site overhead services may be required to support the performance of the Contract by either of the Parties, and if pre-approved by the Executive Committee, appropriate reimbursement shall be made to the Parties for the cost of such services by the Joint Venture as determined by the Executive Committee.

f) The principal place of business for the Joint Venture shall be the principal place of business of the Managing Partner, which is currently located at 10866 Wilshire Boulevard, 7th Floor, Los Angeles, CA 90024.

## PARAGRAPH 6: PROJECT PERSONNEL

a) The Managing Party shall designate a Project Manager who shall be subject to its control. The Project Manager shall be delegated responsibility for the practical execution and carrying out of the Work and shall have such specific powers as the Managing Party may, from time to time, delegate.

b) Peck/Jones agrees that it shall supply and make available to the Project Manager such of its supervisory, managerial and other personnel as shall reasonably be required in order to successfully perform the Contract. Obayashi shall supply such personnel as may be determined by the Executive Committee. Such employees shall remain in the employment of the particular Party and shall not be employees of the Joint Venture, but shall cooperate with and serve under the authority of the Project Manager. All costs of employment of such employees shall be reimbursed or paid to the providing Party as described in Paragraph 11.

## PARAGRAPH 7: WORKING CAPITAL

a) All working capital, when and as required for performance of the Contract, shall be furnished by the Parties in accordance with their Proportionate Shares. The need for working capital and the dates on which it is to be furnished shall be determined by the Managing Party and upon approval of the Executive Committee, each such determination shall be binding and conclusive on the Parties. The Managing Party shall use its best efforts to give written notice at least thirty (30) days prior to the date for payment thereof provided that the giving of less than thirty (30) days' notice shall not affect the obligation of the Parties to make the contribution on the date set for payment. The working capital so provided and all other funds received by the Joint Venture shall be deposited in such banks approved by the Executive Committee and may be withdrawn on the conditions set forth in Paragraph 8.

b) Should either Party (the "Defaulting Party") be unable or fail or neglect to contribute its Proportionate Share of the working capital within 7 calendar days after the date set for the contribution thereof by the Managing Party, the other Party (the "Non-Defaulting Party") may, at its option, in addition to any other remedies which it may have at law or in equity, pay the share of the Defaulting Party (the "Defaulting Party's Contribution"). If the Non-Defaulting Party pays all or part of the Defaulting Party's Contribution, such payments shall be deemed to be demand loans made by the Non-Defaulting Party to the Defaulting Party. Such loans shall be immediately repayable by the Defaulting Party without notice and shall bear interest at a rate per annum equal to 3% above the Prime Lending Rate, but in event shall it exceed the maximum allowable rate under law. Such loans shall be and are hereby declared to be secured by a paramount lien and charge on the interest of the Defaulting Party in the Joint Venture and the Defaulting Party shall and does hereby assign to the Non-Defaulting Party its right to any payments from the Joint Venture as further security for such loans. Partial payments in respect of such demand loan shall be applied firstly to accrued interest and secondly to reduction of principal. Each Party shall execute and deliver to the other such documents as are reasonably necessary to perfect such lien including, without limitation, a Security Agreement and UCC-1 Financing Statements. In this Agreement, "Prime Lending Rate" means that rate declared from time to time by First Business Bank as being its prime lending rate for commercial loans.

c) For any period during which a Defaulting Party remains indebted to the Non-Defaulting Party pursuant to sub-paragraph 7(b) hereof:

   i) the voting strength of the representative of the Non-Defaulting Party shall be increased to 100% and the voting strength of the representative of the Defaulting Party shall be decreased to 0%; and

   ii) the Defaulting Party shall remain obliged to continue to contribute its original Proportionate Share of working capital as required from time to time and

   iii) the Defaulting Party shall remain liable for any losses of the Joint Venture in accordance with its original Proportionate Share.

d) In the event that the Non-Defaulting Party does not pay the Defaulting Party's contribution, the Non-Defaulting Party may, at its option, terminate the Defaulting Party's interest in the Joint Venture, in accordance with Paragraph 15.

e) All working capital advanced shall be repaid to the Parties advancing the same prior to the distribution of any profits. All repayments of working capital shall be in the reverse order to which they were paid in. Each such repayment of working capital shall be repaid to the Parties in the same ratio as it was paid in by the Parties. Prior to any distribution of working capital or any advance distribution of anticipated profit, each Party shall be required to provide its latest audited financial statement for both it and its corporate guarantor, along with a certificate from the Senior Officer of each stating that since the formulation of the financial statement there have occurred no events that would have a material adverse effect on the financial status of their respective

corporations. In no event will repayment of any working capital or advance distribution of anticipated profit reduce the obligation of the Parties for future contributions of working capital or for losses of the Joint Venture.

f) In the event that a Defaulting Party is indebted to the Non-Defaulting Party pursuant to sub-paragraph 7(d) hereof, any monies otherwise payable to the Defaulting Party by the Joint Venture shall be paid to the Non-Defaulting Party to be applied in reduction of the loans until the loans by the Non-Defaulting Party to the Defaulting Party have been paid in full prior to the return of any capital to the Defaulting Party and prior to the distribution of any proceeds or profits of operation.

## PARAGRAPH 8: BANKING

a) A bank account or accounts shall be opened in the name of the Joint Venture in such bank or banks under such description or descriptions as the Executive Committee may determine. All working capital contributions made by the Parties hereto, and all of the funds received by the Joint Venture or by either of the Parties on behalf of the Joint Venture in connection with the performance of said Contract shall be deposited in such bank account or accounts. Withdrawals may be made by check or draft or other instrument in such form as the Executive Committee may from time to time direct. All withdrawals and each check, draft or other instrument shall be signed by two persons authorized by the Executive Committee. No Party will unreasonably restrain and/or refuse to authorize withdrawal of funds for payment of proper expenses relating to the Work. Both Obayashi and Peck/Jones representatives will be signatory on all Joint Venture bank accounts and the signatory cards will be prepared such that each check must be signed by a representative from each Joint Venture Party.

b) All monies received by the Joint Venture, whether as advances by the Parties to this Joint Venture, as payments under the Contract or otherwise, shall be treated and regarded as and are hereby declared to be, trust funds for the performance of the Contract and for no other purpose until the Work shall have been fully completed and accepted by the Owner, and until all obligations of the Parties hereto shall have been paid, or otherwise discharged, or provided for by adequate reserves. Such reserves shall likewise be treated as trust funds until they shall have served the purposes for which they were created.

c) Unless otherwise previously agreed in writing by the Executive Committee, no payments shall be made or monies withdrawn from any such bank account or accounts except for the purposes of the Joint Venture. Monies not immediately required for the purposes of the Joint Venture shall be invested in acceptable securities or other investments in the name of the Joint Venture, so that they may earn interest without interfering with the payment of the current obligations of the Joint Venture as they become due, for purposes hereof. Acceptable securities and investments are U.S. Government Treasury Bills, cash deposit certificates, or commercial paper rated A1P1 or better. Under no circumstances shall such securities or investments be stocks, bonds, or other instruments of debt and equity issued on behalf of either of the Parties or affiliated companies to the Parties of the Joint Venture. No part of any funds deposited in any bank account or accounts of the Joint Venture shall be paid or returned to either of the Parties except as specified herein or as may otherwise be determined by the Executive Committee.

d) No money shall be borrowed or financing arranged for the account of the Joint Venture, nor shall any assets of the Joint Venture be charged, assigned, mortgaged, pledged or hypothecated, unless unanimously approved by the Executive Committee. If any monies are so borrowed, they shall be repaid in full prior to return of any working capital and distribution of gains or profits. The Joint Venture will notify the bank in writing that checks payable to either party or their affiliates require the signatures of representatives from both Parties.

## PARAGRAPH 9: ACCOUNTING

a) Separate books of account of the Joint Venture and its operation shall be kept by Managing Party personnel and maintained at the office of the Managing Party. Financial Statements and other reports, as directed by the Executive Committee, of the financial condition of the Joint Venture shall be made to each Party each month or upon demand by the Executive Committee. All records of the Joint Venture shall be open to examination and photocopy at any reasonable time, including, without limitation, all normal business hours, by any of the Parties hereto. Such records and documents shall not be removed from the place where they are usually kept, without the previous consent of the Executive Committee.

b) The cost of independent audits and the keeping and maintaining of the separate books of account during the course of the Work shall be a part of the cost of the Joint Venture. To the extent records must be kept

subsequent to the completion of the work and the acceptance by all the Parties of the final accounting, they shall be kept at such place as the Parties shall determine and the cost shall be borne by the Parties in accordance with their Proportionate Shares.

c) The currency of the account of the Joint Venture shall be U.S. dollars.

d) The fiscal year for Joint Venture accounting purposes shall be the calendar year. The Managing Party shall have sole responsibility for the preparation and filing of state and federal tax returns, subject to review and approval by the Executive Committee.

## PARAGRAPH 10: BONDS & INSURANCE

a) The Managing Party shall obtain and maintain insurance on behalf of the Joint Venture and each of the Parties hereto as required by the Executive Committee or under the Contract including, without limiting the generality of the foregoing, liability insurance respecting the Work and insurance respecting fire and other perils on all tools, equipment and other assets of the Joint Venture. The type and amount of insurance will be determined by the Executive Committee which shall approve the coverage and cost of said insurance prior to its purchase. All Contract performance, payment and other bonds that may be required by the Joint Venture shall be obtained and maintained in the name of the Joint Venture. All Parties shall lend their commercially reasonable efforts to obtain any and all bonds and insurance required in connection with the Joint Venture. Each shall execute such indemnity agreements and other agreements as may be required by the companies writing the bonds.

b) All premiums for bonds and insurance required on the project and in the name of the Joint Venture shall be a direct cost to the Joint Venture.

c) The broker for all bonds and insurance required by the Joint Venture shall be determined by the Executive Committee.

d) Subject to Paragraph 3 (b) providing that losses, expenses and liabilities, including those arising out of any bonds, shall be borne by the Parties in accordance with their Proportionate Shares, the Parties shall, from time to time, execute applications for bonds, indemnity agreements, and other documents and papers as may be necessary or appropriate in connection with the submission of the proposal for, and the performance of, the contract, in accordance with the following percentages:

| PARTY | PERCENTAGE |
|-------|-----------|
| Peck/Jones | 5% |
| Obayashi | 95% |

## PARAGRAPH 11: TREATMENT OF COSTS

a) Costs incurred by either of the Parties hereto in the performance of the Contract or while directly engaged in the business of the Joint Venture shall be reimbursed by the Joint Venture to such Party to the extent provided in Exhibit 2. Notwithstanding the foregoing, reimbursable costs shall be limited to:

i.) The salary and all other employment-related expenses including, benefits, payroll taxes and deductions of approved office and field personnel, for the period of direct involvement, provided prior approval of the Executive Committee has been received;

ii) All reasonable costs of travel, lodging, food, subsistence and such related miscellaneous expenses in accordance with the Party's company policies provided prior approval by the Executive Committee has been received;

iii) Obayashi and Peck/Jones will invoice the Joint Venture for any reimbursable costs, and will be paid by checks signed by representatives from both Obayashi and Peck/Jones. The invoice backup will include the

detail of compensation for services or equipment rental provided by either one of the Parties, provided prior approval of the Executive Committee has been received.

b) Costs reimbursable to the Parties shall not include any charges for expenses in submitting the bid, unless otherwise authorized in accordance with Paragraph 2(d).

c) Salary costs and travel expenses of the members of the Executive Committee shall not be reimbursed to the Parties of the Joint Venture, nor shall the salary costs and other travel expenses of other members of management of the Parties to the Joint Venture not directly engaged in the business of the Joint Venture.

d) Each Party shall submit to the Joint Venture, at least five (5) days before billings are to be submitted by the Joint Venture to the Owner under the Contract, documentation approved by its designated representative, showing amounts due such Party for costs incurred to date. If required, documentation shall be in such a form to enable the Joint Venture to meet the billing requirements of the Contract.

e) Direct job costs for field supervision, labor, materials, equipment, subcontractors, insurance, bonds, taxes, supplies, services, relocation costs and other expenses necessary for the performance of the Contract shall be incurred and paid directly by the Joint Venture.

## PARAGRAPH 12: TAXES

a) Taxes and duties levied upon the Joint Venture as an entity, if any, shall be borne by the Joint Venture prior to the repayment of working capital or distribution of profits. For income tax purposes, Federal, State, or otherwise, the Parties hereby elect and agree that the Joint Venture shall not be taxed as an entity but each Party shall be taxed separately on its share of the profits of the Joint Venture. Each Party hereto shall be separately responsible for any taxes levied on its receipts from the Joint Venture or otherwise incurred of whatsoever description and shall indemnify the other Party in respect of its liability therefor.

b) The Managing Party is designated the Tax Matters Partner for all purposes of the Internal Revenue Code and corresponding state law.

## PARAGRAPH 13: ASSETS

a) All tools and equipment used in the Work shall be purchased, rented or leased by the Joint Venture at competitive prices. The Managing Party may purchase, rent or lease such tools and/or equipment in the name of the Joint Venture, providing however, any capital expenditures in excess of $5,000.00 shall first be approved by the Executive Committee. Any Party hereto may rent its own tools and equipment to the Joint Venture providing that the terms of this paragraph are complied with.

b) The Managing Party shall notify all Parties of the need for rented equipment and allow all Parties the opportunity to furnish rented equipment to the Joint Venture.

c) Equipment rented from a Party shall not exceed three (3) months duration without approval of the Executive Committee and shall be charged as a direct cost at a rate to be negotiated and agreed upon by the Executive Committee.

d) During the course of the Work and upon completion of the Work, the Managing Party shall determine what part of the plant, equipment, tools and salvageable materials belonging to the Joint Venture are no longer needed for completion of the Contract, and shall dispose of the same in such manner, at such times, and at such prices as the Executive Committee shall determine. In the event the Executive Committee is unable to unanimously agree as to a manner, a time and price for any such disposition, the plant, equipment, tools and salvageable materials so determined to be surplus shall be disposed of as follows:

i) The Parties shall employ, at the expense of the Joint Venture, two (2) qualified persons to examine and appraise each such piece of plant, equipment, tools and salvageable materials. A copy of such appraisal shall be sent promptly to each Party hereto. Each Party shall have the privilege to notify the Joint Venture in writing within ten (10) days of the date of receipt of such appraisal of which, if any, such pieces of plant, equipment, tools and salvageable materials each Party wishes to purchase at the price set forth in such appraisal, and either Party so notifying the Joint Venture of its desire to purchase any such piece of plant, equipment, tools and salvageable materials shall be permitted to do so at the price set forth in such

appraisal at any time within thirty (30) days after so notifying the Joint Venture of its desire to purchase; provided, however, in case more than one Party desires to purchase the same lot or piece of plant, equipment, tools or salvageable materials the same shall be divided by the Executive Committee amongst the Parties based on highest negotiated price received, each Party having the opportunity to a final bid.

ii) Any such piece of plant, equipment, tools or salvageable materials not disposed of pursuant to subparagraph (i) above may be sold by the Managing Party at the appraised value thereof set forth in the appraisal referred to in subparagraph (i) above.

iii) Any piece of plant, equipment, tools and salvageable materials not disposed of pursuant to subparagraphs (i) and (ii) shall be distributed by the Executive Committee to the Parties in proportion to their interest in the Joint Venture according to a formula based upon the appraised value referred to in subparagraph (i) above.

iv) When a Party has acquired any surplus pursuant to the foregoing, it shall thereafter be responsible for its prompt removal and care.

## PARAGRAPH 14: DISTRIBUTION OF ASSETS/LIABILITIES

a) The Executive Committee may determine from time to time during the course of the Work, that some of the assets held and acquired by the Joint Venture may be divided among or paid to the Parties, in accordance with their original Proportionate Share.

b) Upon completion of the Work, receipt of final payment under the Contract and all other accounts receivable including proceeds of the sale of all plant, equipment, tools and salvageable materials and other real or personal property sold in accordance with the provisions herein, and after paying or providing for payment of all known costs and expenses of the Joint Venture and after repayment of all loans of the Joint Venture and after reimbursing the Parties for costs as herein provided and after setting aside such reserves for unsettled claims, demands and other contingencies as the Executive Committee may deem proper and advisable, and after the repayment of all sums advanced for working capital, the Executive Committee shall cause a final accounting to be prepared showing the total net profit earned or loss incurred by the Joint Venture. The books of account of the Joint Venture shall establish whether a profit has been realized or a loss sustained and the amount of such profit or loss.

c) If such final accounting shall indicate that a net profit has been realized such profit shall be distributed among the Parties in proportion to their entitlement to profits of the Joint Venture in accordance with Paragraphs 3, 7 and 14 hereof. When and if the monies set aside as reserves for the payment of unsettled claims and demands and other contingencies are no longer required for the purposes intended, then such monies shall be similarly distributed among the Parties.

d) If the performance of the Contract results in a loss, the Parties shall be obligated in accordance with their respective original Proportionate Shares, for any such loss (irrespective of the fact that any Party may have advanced more than its Proportionate Share of working capital as provided above). Such proportionate liability for each Party for the bearing of losses shall continue with respect to any claims which, at any time either before or after the completion of the Contract or before or after the distribution of all proceeds and assets of the Joint Venture, shall be made against them, or any of them, by reason of the Joint Venture.

## PARAGRAPH 15: TERMINATION AND DEFAULTS

a) This Agreement and the Joint Venture created hereby shall commence as of the day and date first above written above, and unless extended by agreement of the Parties, shall terminate upon the first to occur of the following:

i) The owner's announcement that the Project has been canceled or that award of the Contract has been postponed indefinitely;

ii) An uncontested award of the Contract to another bidder;

iii) Termination of the Contract, whether upon full performance, default, or otherwise;

iv) The agreement of the Parties to terminate this Agreement;

b) If either Party hereto (the "Section 15 – Defaulting Party") shall:

   i) commit an act of bankruptcy; or

   ii) become bankrupt; or

   iii) take the benefit of any statute now or hereafter in force for bankrupt or insolvent debtors; or

   iv) takes or omits to take any action which results in a default under the Contract or under this Agreement, which default is not cured prior to the end of any cure period permitted with respect to such action or omission; or

   v) if an order is made or a resolution is passed for the winding-up or other termination of its existence; or

   vi) a liquidator, receiver or receiver-manager of its business or undertaking is duly appointed; then the Paragraph 15 - Defaulting Party's interest in the Joint Venture shall forthwith terminate.

c) If any Party hereto (the "Section 15 - Defaulting Party") shall default in any of its obligations under this Agreement including, without limiting the generality of the foregoing, a failure to make available personnel as required hereunder, a failure to make available the benefit of its experience, technical knowledge and skill as required hereunder, or a failure to contribute its share of working capital (subject to Paragraph 7), then the other Party (the "Section 15 – Non-Defaulting Party") may give written notice to the Section 15 - Defaulting Party specifying the event of default. In the event that the Section 15 - Defaulting Party does not cure any voluntary default under Sections 15(b)(I), (II), (iii), (v) or (vi) within forty-five (45) days after receipt of such notice then the Section 15 – Non-Defaulting Party may terminate the Section 15 - Defaulting Party's interest in the Joint Venture.

In the event that the Section 15 - Defaulting Party does not cure any involuntary default under Section 15(b)(i), (ii), (iii), (v) or (vi) within one-hundred twenty (120) days after receipt of such notice, then the Section 15 - Non-Defaulting Party may terminate the Section 15 - Defaulting Party's interest in the Joint Venture.

d) Upon termination of the Paragraph 15 - Defaulting Party's interest in the Joint Venture:

   i) the Section 15 - Non-Defaulting Party may take over and complete the Work;

   ii) the Section 15 - Defaulting Party shall have no entitlement to share in any of the profits of the Joint Venture;

   iii) the Section 15 - Defaulting Party shall have no right to participate in the management or operation of the Joint Venture and shall have no further right to be signatory on Joint Venture bank accounts;

   iv) the Section 15 - Defaulting Party shall continue to be liable for all existing and future losses and liabilities of the Joint Venture including liabilities to the Paragraph 15 - Non-Defaulting Party under Paragraphs 2 & 18 hereof, in accordance with its original Proportionate Share; and,

   v) the Section 15 - Defaulting Party shall only be entitled to the return of its contributions to working capital upon completion of the Work and after payment of all other liabilities in accordance with Paragraph 14 of this Joint Venture Agreement, provided that such payments shall not be made until termination of the Joint Venture.

e) The Section 15 - Defaulting Party hereunder shall defend, indemnify and hold harmless the Section 15 Non-Defaulting Party for any loss, claims or liabilities which the Section 15 - Non-Defaulting Party may incur arising out of any breach of this Joint Venture Agreement by the Section 15 - Defaulting Party. The Section 15 - Defaulting Party further agrees to pay all legal expenses required of or by the Section 15 - Non-Defaulting Party to protect their interests or defend any action arising out of the Section 15 - Defaulting Party's breach, including court costs and disbursements and reasonable attorneys' fees.

f) The remedies herein provided shall be in addition to and shall not limit any remedies the Section 15 Non–Defaulting Party may have at law or in equity or otherwise.

g) Provision for the payment of debts: Upon termination of this Agreement, the Executive Committee shall make appropriate arrangements, including the establishment of adequate reserves, for the payment of all debts and the performance of all obligations of the Joint Venture.

h) Distribution: At the conclusion of the Joint Venture, the assets of the Joint Venture shall be allocated first to pay all debts and obligations of the Joint Venture and to fund all reserves established for such payments. All remaining assets shall be distributed to the Parties in accordance with their respective participation interest in profits, as those interests may have been adjusted by the terms of this Agreement.

i) Despite the termination and dissolution of the Joint Venture, the Parties will remain liable for any claims of damages due to defective work, incomplete work, abandonment and/or payment to subcontractors.

## PARAGRAPH 16: SUCCESSORS AND ASSIGNMENT

a) Each Party acknowledges that it is entering into this Agreement in reliance upon the other Party being and remaining a Party to this Agreement. Neither Party may withdraw from the Joint Venture, assign, transfer, pledge or hypothecate its interest, whether directly or by merger with or acquisition by another entity, or any part thereof, in the Joint Venture or in the Contract or in this Agreement or in any property or monies of the Joint Venture, except with prior written consent of the other Party and upon such terms as it may reasonably require.

b) Subject to the foregoing provisions, this Agreement shall inure to the benefit of and be binding upon the Parties hereto, their successors, permitted assigns and legal representatives.

## PARAGRAPH 17: DISPUTES

Any dispute between the Parties arising out of or related to the Work, Contract or this Agreement shall, if not resolved by the Executive Committee, be resolved by good faith negotiation by the Senior Officers of the Parties. In the event that the dispute, after having been negotiated on at least two separate occasions by the Senior Officers, is still not resolved, it shall then be resolved by arbitration as follows:

a) The Party wishing to invoke arbitration shall deliver to the other Party a list of five (5) individuals each of whom (I) has not less than ten (10) year experience in arbitrating construction industry disputes and/or representing parties with respect to construction industry disputes, and (ii) is available and will agree to hear the matter within the next forty–five (45) calendar days. The Party receiving the list will have fifteen (15) days from such receipt to select one (1) person from the list to be the Arbitrator, and if it fails to select the Arbitrator within the fifteen (15) day period, the Party delivering the list shall then select the Arbitrator from that list. Within ten (10) days after his selection, the Arbitrator shall schedule an arbitration hearing to be held not less than thirty (30) days thereafter, and not more than forty–five (45) days thereafter. The location of the hearing shall be in the County of Los Angeles. The purpose of the hearing shall be to receive testimony and evidence from the Parties and decide the matter. The Parties shall be entitled to rights of discovery as set forth in the California Code of Civil Procedure for civil actions tried in the superior courts of the state of California. This arbitration agreement shall be governed by the Federal Arbitration Act, notwithstanding any choice of law provision contained in this Agreement.

b) To the extent not inconsistent herewith, the arbitration proceeding will be carried out in accordance with the construction industry rules of the American Arbitration Association as then in effect, in the most expeditious manner possible. The Arbitrator shall have the power to issue injunctions, orders, and any other equitable relief that could be ordered by a court of competent jurisdiction. The Arbitrator shall also have the authority to award damages, costs, interests, expenses, and attorney's fees in such amounts as the Arbitrator shall deem appropriate. The Arbitrator shall make his decision and any award according to the terms and provisions of this Agreement, and such award shall set forth a statement of decision of the Arbitrator. Judgment may be obtained on the Arbitrator's decision or award enforced in and through any court having appropriate jurisdiction.

c) Notwithstanding any Demand for Arbitration or any pending arbitration proceeding brought pursuant to this Paragraph, the Parties shall be obligated to continue to work on the Project diligently and to contribute their

proportionate share of funds, personnel, plant, and equipment, regardless of whether the Demand for Arbitration or pending arbitration calls into dispute the obligation of either Party to continue to work on the Project or to contribute funds, personnel, plant or equipment.

d) The "Prevailing Party" shall be entitled to recover all legal and consulting fees and costs incurred on account of such dispute. "Prevailing Party" shall mean the Party that recovers the greater portion of all amounts disputed and any claims and counterclaims between the Parties being arbitrated, less any amounts attributable to the fees and costs described in this subparagraph.

e) THE PARTIES AGREE THAT THE DECISION OF THE ARBITRATOR SHALL BE BINDING UPON THEMSELVES, THEIR SUCCESSORS AND ASSIGNS, AND HEREBY WAIVE APPEAL OF SUCH DECISION.

_____          _____
Obayashi's Initials                              Peck/Jones' Initials

### PARAGRAPH 18. INDEMNITY

In connection with or in carrying on its or his duties or responsibilities pursuant to this Agreement or under the Contract, neither of the Parties hereto, the Managing Party, the Project Manager, the members of the Executive Committee and their respective directors, or officers and employees shall be liable to the Joint Venture or either of the Parties hereto for its or his acts or omissions, whether or not such acts or omissions are negligent, provided that it or the person is not: (a) acting in bad faith, (b) grossly negligent, (c) acting in a manner that breaches the provisions of this Agreement by exceeding the scope of authority granted by this Agreement.

To the fullest extent permitted by law and in addition to all other indemnities contained herein and available to the Parties at law or in equity, the Joint Venture shall indemnify, defend and save harmless each Joint Venture Partner from any claims, losses, damages, costs, liabilities, and claims arising from or in connection with the carrying out of its duties and responsibilities under this Agreement and/or the Contract, except in the event of: (a) acts of bad faith by the Party seeking indemnity; (b) gross negligence by the Party seeking indemnity, (c) acts in a manner that breach the provisions of this Agreement by exceeding the scope of authority granted by this Agreement by the Party seeking indemnity.

Notwithstanding any other provision hereof, including, without limitation, Paragraph 3, each Party ("Indemnifying Party") shall indemnify, defend and save harmless the Joint Venture and the other Party from any claims, losses, damages, costs, and liabilities arising from or in connection with (a) acts of bad faith by the Indemnifying Party; (b) gross negligence by the Indemnifying Party; and (c) acts of the Indemnifying Party that breach the provisions of this agreement by exceeding the scope of authority granted by this Agreement to the Indemnifying Party.

### PARAGRAPH 19: FINANCIAL DISCLOSURE

The Parties shall submit audited financial statements to each other at least annually and certificates from each Parties' chief financial officer semi-annually (on the date that is 6 months following their corporate year-end) certifying that there has been no material change in the financial condition of each Party. Failure to provide financial statements or certifications shall constitute a default of under this Agreement if not cured within ten (10) days of written notification.

### PARAGRAPH 20: GOVERNING LAW

The provisions of this Agreement shall be construed and enforced in accordance with the laws of the State of California.

### PARAGRAPH 21: LEGAL COUNSEL

a) The Managing Party shall retain, for the duration of this Agreement, legal counsel agreeable to the Executive Committee for use in connection with any matters of concern to the Joint Venture which may require legal counsel or assistance. The expense of such legal counsel shall be borne by the Joint Venture.

b) Such legal counsel shall represent the Joint Venture and shall not represent the individual interests of any Party relating to the Joint Venture, the Contract, the Work or this Agreement without the consent of the others. If

separate counsel is required to represent the interests of any Party, then subject to Paragraph 32 of this Agreement, such Party shall be solely responsible for selecting and compensating its legal counsel.

## PARAGRAPH 22: NOTICE

Any demand, notice or other communication to be given in connection with this Agreement shall be given in writing and shall be given by personal delivery, by registered mail, or by fax addressed to the recipients as follows:

a) For Peck/Jones:
Dan A. Penn
Peck/Jones Construction Corporation, 10866 Wilshire Blvd., Suite 700, Los Angeles, CA 90024
Fax: (310)470-3175

b) For Obayashi:
  · Ralph W. Man
Obayashi Corporation, 420 East 3rd Street, Suite, Los Angeles, CA 90013
Fax: (213)687-4317

or to such other address/fax number as may be designated by notice given by either Party to the other. Any communication given by personal delivery shall be conclusively deemed to have been given on the day of actual delivery thereof and, if given by registered mail, on the fifth (5th) business day following the deposit thereof in the mail and, if given by fax, on the day of transmittal thereof. In the event of the disruption of postal service, communications shall be given only by personal service or by transmittal by fax.

## PARAGRAPH 23: PUBLICITY

Any advertisement, press release or statement by either Party hereto which involves the other Party or the Joint Venture shall meet with prior approval of the Executive Committee. All such advertisements, press releases or statements where practicable shall make due reference to and acknowledgment of the work performed or to be performed by both Parties.

## PARAGRAPH 24: OWNERSHIP AND USE OF DOCUMENTS

All documents produced for or by the Joint Venture shall be owned by the Joint Venture. Upon termination of this Agreement, each Party shall own an undivided interest in such documents in proportion to the entitlement of such Party to the profits of the Joint Venture. The documents shall be stored at a location determined by the Executive Committee and neither Party shall use these documents for other projects without the prior written consent of the other. Any Party may make duplicate copies of such documents without consent of the other Party.

## PARAGRAPH 25: INTERPRETATION

a) The captions and headings used herein are for convenience and reference only and shall not limit or expand, or be referred to in interpreting or construing the provision hereof.

b) Whenever the singular or masculine or neuter is used in this Agreement, the same shall be construed as meaning the plural or feminine or body politic or corporation and vice versa where the context so requires.

c) All exhibits attached hereto are incorporated herein by this reference.

d) This Agreement shall be construed as having been drafted by both Parties hereto, for the benefit of the Parties hereto only, and not for the benefit of any third-parties.

## PARAGRAPH 26: FURTHER ASSURANCES

· Each of the Parties hereto shall from time to time execute and deliver all such further documents and instruments and do all acts and things as the other Party may reasonably require to effectively carry out or better evidence or perfect the full intent and meaning of this Agreement.

### PARAGRAPH 27: TIME IS OF THE ESSENCE

Time shall be of the essence of this Agreement.

### PARAGRAPH 28: JOINT VENTURE ONLY

In view of the limited purposes of the Joint Venture, neither of the Parties shall have any obligations (fiduciary or otherwise) with respect to the Joint Venture or to the other Party insofar as making other investment, construction, development, or other business opportunities available to the Joint Venture or to the other Party. Each Party may, notwithstanding the existence of this Agreement, engage in whatever activities such Party may choose, whether the same are competitive with the Joint Venture or otherwise, without having or incurring any obligation to offer any interest in such activities to the Joint Venture or to the other Party. Neither this Agreement nor any activities undertaken pursuant hereto shall prevent any Party from engaging in such activities, and the fiduciary duties of the Party shall be limited solely to those arising from the purposes of the Joint Venture described in the Agreement.

### PARAGRAPH 29: UNENFORCEABILITY

Unenforceability of any part of this Agreement shall affect that part of this Agreement only and the rest of this Agreement shall remain in force and unaffected.

### PARAGRAPH 30: ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the Parties in regard to the subject matter hereof, subject to no other oral or written proposals, agreements or understandings whatsoever and may only be subsequently supplemented or amended by a written agreement subscribed by the Parties hereto.

### PARAGRAPH 31: COUNTERPARTS

The Agreement may be executed in any number of counterparts, each of which shall be deemed an original and together shall constitute but a single instrument.

### PARAGRAPH 32: ATTORNEY'S FEES

Should any litigation or other dispute resolution process be commenced between the Parties hereto or their representatives concerning any provision of this Agreement or the rights and duties of any person or entity in relation thereto, the Party prevailing in such litigation or other dispute resolution process, whether by award, final judgment or out-of-court settlement, shall be entitled, in addition to such other relief as may be granted, to an award of all reasonable attorneys' fees and costs incurred in such litigation, including, without limitation, fees and costs incurred with regard to post judgment motions, contempt proceedings, garnishment, levy and debtor and third-party examinations, discovery, and bankruptcy litigation, without regard to any schedule or rule of court purposing to restrict such an award.

### PARAGRAPH 33: NO WAIVER

No waiver by either Party of any breach or default hereunder shall be deemed a waiver of any other breach or default, and no delay or forbearance by either Party hereunder in enforcing any of its rights or remedies shall be deemed a waiver of any such rights or remedies, unless such waiver is embodied in a writing signed by the authorized representatives of the Party to be bound.

### PARAGRAPH 34: LAWS/COMPLIANCE

Each Joint Venture Partner covenants that it will comply with all laws, rules and regulations affecting the Joint Venture and the work of the Contract. Furthermore, to the fullest extent permitted by law and in addition to all other indemnities contained herein or available to the Parties at law or in equity, each Joint Venture Partner shall indemnify, defend and hold harmless the other Joint Venture Partner from and against all costs, expenses, liabilities, claims, demands and judgments, including, without limitation, reasonable attorneys' fees and costs, arising out of or in connection with such Party's failure to so comply.

## PARAGRAPH 35: JOINT AND SEVERAL LIABILITY

Notwithstanding anything to the contrary contained in this Agreement to the contrary, the parties hereto acknowledge and agree that they are jointly and severally liable for the obligations of the Joint Venture, including, without limitation, the obligations of the Joint Venture under the Contract with Cedars–Sinai Medical Center and the Agreement between Owner and Contractor for Preconstruction Services with Cedars Sinai Medical Center.

IN WITNESS WHEREOF the Parties hereto, intending to be legally bound, have affixed their corporate seals under the signatures of their officers duly authorized in that behalf.

COMPANY:      Obayashi Corporation, a Japanese Corporation

Per:

Name:      Takayuki Fujisawa

Title:      General Manager,
           U.S. Western Regional Group

COMPANY:      Peck/Jones Construction Corporation, a California Corporation

Per:

Name:      Dan A. Penn

Title:      President, CEO

# EXHIBIT 1

## PROJECT STATUS REPORTS

On a monthly basis the Project Manager, with support from the Managing Party, will produce a Project Status Report. The report will be submitted to all members of the Executive Committee not later than the third Friday of the month following the month which the report covers. The contents of the report will include but will not necessarily be limited to the following:

### Executive Overview

Presented in a narrative format to briefly capture the highlights of the various reports and schedules contained in greater detail in the remainder of the status report. It should outline major accomplishments of the month, owner relations, labor relations and any major problems.

### Financial Summary

A monthly financial statement calculated on the percentage completion basis with following supporting schedules and reports:

- the percentage completion calculation details (i.e., estimates, reserves, etc.)
- month-end general ledger trial balance
- detail of the month's general ledger transactions
- month-end cash reconciliation's for all JV bank accounts with a detail listing of outstanding checks
- copies of all bank statements
- aged accounts receivable trial balance with detail of any owner holdbacks
- aged account payable trial balance
- invoice backup and explanations for any general and administrative expenses
- copies of owner billings or revised owner billings

### Progress Payment Summary

A report which details the current contract revenue including approved changes, the revenue received to date and the holdback.

### Organizational Chart

Outlining the reporting structure of the project management team.

### Staff Schedule
A simple bar chart schedule detailing the original planned and current forecast duration for each staff person covered by the organizational chart.

### Construction Schedule

CPM schedule at an appropriate level of detail.

## JV Asset List

A listing of all plant, equipment, tools and other salvageable materials owned by the Joint Venture with details on purchase value and current depreciated value.

## Equipment Schedule

A simple bar chart listing all major equipment owned or rented by the Joint Venture and planned durations.

## Project Cost & Forecast Summary

A single page report covering, in summary totals format, the original cost, fee and revenue, the changes in each due to approved change orders and quantity variations and the forecasted final position. Costs will be broken down in four cost categories (labor, equipment, materials and subcontracts). A graphic illustration of current revenue, fee variance and safety frequency over time will he included.

## Project Cost & Forecast Detail Report

A complete report detailing original, to date and projected final quantities and costs by cost code and cost category.

## Subcontract Status Report

A report listing all subcontracts entered into on the project and the current status of each, including revisions, balance to complete and retainage.

## Change Order Status Report

A report listing all approved, unapproved and pending change orders on the project. The value and current cost and revenue related to each will also be covered.

## Environmental Safety and Loss Control Report

A report detailing project safety statistics and details on claims.

## Photographs

Photographs illustrating project progress.

## EXHIBIT 2

## SERVICES OF CORPORATE AND DISTRICT OFFICES

| Description | JV Member's Non-reimbursable Costs (Costs not reimbursable from the joint venture) | Management Fee Costs (Costs borne by the Managing Partner) | Direct Joint Venture Costs (Costs paid directly by the joint venture) |
|---|---|---|---|
| **1. Salaries & Burdens** | | | |
| **i) Pre-Proposal** | | | |
| Sponsors all pre-proposal salaries & burdens | x | | |
| **ii) Pre-Award** | | | |
| Sponsors salaries & burdens | x | | |
| **iii) Post-Award** | | | |
| Sponsors Corporate Executives | | x | |
| Sponsors Joint Venture Project Manager | | | x |
| Sponsors Corporate Equipment Manager | | x | |
| Sponsors Corporate Purchasing Agent | | x | |
| Sponsors Corporate Labor Relations Manager | | x | |
| Sponsors Corporate Administration Manager | | x | |
| Sponsors Joint Venture Administration Manager | | | x |
| Sponsors Corporate Human Resources Manager | | x | |
| Sponsors Part-time Corporate Safety Manager | | | Reimbursed at on a per hour basis and invoiced separately from full-time Joint Venture personnel |
| Sponsors Corporate Office | | x | |
| Sponsors Corporate Information Systems Personnel | | x | |
| Intentionally Blank | | | |
| All staff assigned full-time to Joint Venture and located on site or in the Corporate Office prior to site office set-up | | | x |
| Sponsors corporate accounting and payroll personnel | | x | |

| Description | JV Member's Non-reimbursable Costs (Costs not reimbursable from the joint venture) | Management Fee Costs (Costs borne by the Managing Partner) | Direct Joint Venture Costs (Costs paid directly by the joint venture) |
|---|---|---|---|
| Sponsors office personnel when they are performing a specific assignment at the request of the Executive Committee | | | x |
| Statutory burdens | Allocated in the same way as the associated salary. | | |
| Benefits (typically vacation, health, dental, life, accidental death and dismemberment, long term disability, pension, deferred compensation) | Allocated in the same way as the associated salary. | | |
| Vehicle/car allowances | Allocated in the same way as the associated salary. | | |
| 2. Travel & Accommodation (Including Room & Board) | x | | |
| 3. Personnel Placement Fees | x | | |
| 4. Moving Expenses | x | | |
| 5. Data Processing | | | |
| i) Hardware | | | |
| In corporate office | | x | |
| On site or any on site modifications | | x | |
| Third party modifications to district equipment necessitated by project requirements. | | x | |
| ii) Software | | | |
| In corporate office | | x | |
| On-site or any on-site modifications | | x | |
| Modifications to corporate software | | x | |
| Necessitated by project requirements including in-house programming expense | | x | |
| iii) Communications (including modem line, gateway and third party hook-up expense) | | | |
| When using all or part of Corporate business system | | x | |
| Other communication requirements of Joint Venture (i.e. third party support modems, etc.) | | | x |
| iv) Corporate office system development and support assessments | | x | |
| v) Training | | | |
| Sponsors initial in-house training and support | x | | |
| Third party training and support | x | | |
| 6. Estimating Expenses | | | |
| Pre-award | x | | |
| Post-award | x | | |
| 7. Engineering Expense | | | |
| Pre-award | x | | |

| Description | JV Member's Non-reimbursable Costs (Costs not reimbursable from the joint venture) | Management Fee Costs (Costs borne by the Managing Partner) | Direct Joint Venture Costs (Costs paid directly by the joint venture) |
|---|---|---|---|
| Post-award including sponsors in-house corporate engineering expense | x | | |
| 8. Scheduling Expenses | | | |
| Pre-award | | x | |
| Post-award | | x | |
| 9. Licensing & Registration Fees | | | |
| Pre-award (partners individual registration) | x | | |
| Post-award or pre-award Joint Venture registration | | | x |
| 10. Legal Expenses – Post-ward Joint Venture only | | | x |
| 11. Insurance & Bonding | | | x |
| 12. Payroll Services (this does not include the direct payroll expense, only the cost of generating the payroll) | | x | |
| 13. Accounting personnel on site, full-time | | | x |
| 14. Miscellaneous Office Supplies | | | |
| i) Supplies purchased by jobsite | | | x |
| ii) Joint Venture stationery, business cards, checks, etc. | | | x |
| iii) Courier Expenses | | | |
| Originating on jobsite or from third-parties to jobsite | | | x |
| Originating in Partner's office | | | x |
| iv) Long Distance | | | |
| Originating on jobsite | | | x |
| Originating in Partner's office | x | | |
| v) Bank Charges | | | |
| Joint Venture bank accounts | | | x |
| vi) Office Space | | | |
| Pre-award | x | | |
| Corporate office | | x | |
| Third-party landlord or trailers | | | x |
| viii) Copying Charges | | | |
| Corporate office copy charges | | x | |
| Third party copy charges | | | x |
| On-site copy charges | | | x |

The foregoing table outlines the division of services covered by specific personnel of the Managing Party. This narrative is intended to provide details on the nature and scope of those services.

1. Salaries & Burdens

Pre-Award:

Prior to the award of the Project all salaries and burdens of personnel who may be involved in negotiations with the Owner will be borne by the partners. The only exception to this would be if the Executive Committee determined it was in the Joint Venture's interest to establish the Project team and begin detailed project planning. In that event, and with approval of the Executive Committee the costs would be a Joint Venture cost.

Post-Award:

Corporate executives of the Managing Party will, in general, offer support and assistance to the Project Manager and his staff regarding the due performance of the Project and the Contract subject to the superior authority of the Executive Committee. More specifically their involvement could include, but is not limited to, the following:

- Providing preliminary advice on contractual issues prior to obtaining legal advice,

- Providing advice on union or labor issues, and

- Monitoring the performance of the Project Manager to ensure that any critical contractual or financial issues are communicated to the Executive Committee without delay.

The corporate Equipment Manager will provide advice, support and assistance to the Project Manager on the following:

- Selection and acquisition of plant, equipment and tools,

- Establishment of a preventative maintenance program (including record keeping and costing) for all plant, equipment and tools,

- Negotiation with plant and equipment suppliers on warranty issues, and

- All matters relating to management of Joint Venture plant and equipment.

The corporate Purchasing Agent will provide advice, support and assistance to the Project Manager on the following:

- Selection of subcontractors and suppliers,

- Negotiating and preparing purchase orders and subcontract agreements,

- Establishment of a program to track and monitor purchase orders and subcontracts,

- Establishment of a program to track and monitor minority suppliers and subcontractors to ensure compliance with the Contract, and

- All matters relating to management of suppliers and subcontracts.

The corporate Labor Relations Manager will provide advice, support and assistance to the Project Manager on the following:

- Discussions and negotiations with the various trade unions at project startup, negotiations and settlement of labor disputes which may arise during the course of the Project, and in all matters relating to labor relations.

The corporate Administration Manager will provide advice, support and assistance to the Joint Venture Administration Manager on the following:

- Establishment and operation of the business system for all project accounting functions (payroll, accounts payable, banking, tax accounts, receivables),

- Ensuring all payroll, taxation and accounting practices are in compliance with statutory requirements,

- Ensuring that Bonds and Guarantees are released at the earliest possible time for the benefit of the Joint Venture,

- Establishment and operation of banking facilities in the name of the Joint Venture as approved by the Executive Committee,

- Obtaining and maintaining all required insurance coverage as approved by the Executive Committee, as well as handling insurance claims,

- Controlling the investment of surplus funds as approved by the Executive Committee,

- Ensuring that all project records are maintained and retained to comply with any statutory requirements,

- Selecting and coordinating with an external auditor as and when requested by the Executive Committee, and

- All matters relating to the administration of the Contract and the business of the Joint Venture.

The corporate Safety Manager will provide support and assistance to the Project Manager on the following:

- Preparation of the Project Environmental Safety and Loss Control Program,

- Monitoring safety and loss control performance to ensure compliance with Contract or statutory requirements,

- Assisting with Environmental and Safety Audits, and

- All matters relating to safety and loss control.

The corporate Information Systems Manager will provide advice, support and assistance to the Project Manager on the following:

- To determine the system requirements,

- Selection of hardware and software to operate the system and installation of the system,

- Troubleshooting system problems, and

- All matters relating to selection, installation and operation of information systems.

# FIRST AMENDMENT
# TO
# JOINT VENTURE AGREEMENT

This FIRST AMENDMENT ("First Amendment") to that certain JOINT VENTURE AGREEMENT ("Agreement") dated February 29, 2000, by and between PECK/JONES CONSTRUCTION CORPORATION, a California corporation ("Peck/Jones"), and OBAYASHI CORPORATION, a Japanese corporation ("Obayashi"), is made and entered into as of the 29th day of February, 2000. [Peck/Jones and Obayashi are from time to time hereinafter referred to individually as the "Party" and collectively as the "Parties".]

The Parties hereby agree and confirm that the Managing Party, as defined in Paragraph 5 of the Agreement, is specifically authorized to execute and enter into contracts on behalf of the Joint Venture, including, but not limited to, the Contract (as defined in the Agreement's recitals), a preconstruction contract and other contracts with Cedars-Sinai Medical Center, a California nonprofit corporation, with respect to the Project (as defined in the Agreement's recitals).

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound, have affixed their corporate seals next to the signatures of their officers duly authorized to act on their behalf.

COMPANY: OBAYASHI CORPORATION, a Japanese corporation

By: _____

Name: Takayuki Fujisawa

Title: General Manager, U.S. Western Regional Group

COMPANY: PECK/JONES CONSTRUCTION CORPORATION, a California corporation

By: _____

Name: Dan A. Penn

Title: President and CEO

# SECOND AMENDMENT

## TO

## JOINT VENTURE AGREEMENT

This SECOND AMENDMENT ("Second Amendment") to that certain JOINT VENTURE AGREEMENT ("Agreement") effective February 29, 2000, by and between PECK/JONES CONSTRUCTION CORPORATION, a California corporation ("Peck/Jones"), and OBAYASHI CORPORATION, a Japanese corporation ("Obayashi"), as amended by that certain FIRST AMENDMENT TO JOINT VENTURE AGREEMENT, dated as of February 29, 2000 ("First Amendment"), is made and entered into as of October 17, 2000. [Peck/Jones and Obayashi are from time to time hereinafter referred to individually as the "Party" and collectively as the "Parties".]

The Parties hereby agree as follows:

1.     The recitals set forth in the Agreement are hereby restated to read in their entirety as follows:

"WHEREAS, the Parties are interested in entering into a contract or contracts (each such contract hereinafter individually referred to as the "Contract") with CEDARS-SINAI MEDICAL CENTER, a California nonprofit corporation (the "Owner"), pursuant to which the Parties (as the "Contractor" under each such Contract) may jointly provide pre-construction services and/or the services of a general contractor for the construction of one or more of the Owner's projects (the services under each such Contract hereinafter referred to as the "Work"), including, but not limited to, the Diagnostic and Treatment Center Project and the Central Plant Project (each such project hereinafter individually referred to as the "Project" and more particularly described in its respective Contract); and

WHEREAS, the Parties hereto have agreed to form a Joint Venture for the purpose of: (a) submitting joint proposals to enter into each Contract with the Owner for the joint performance by the Parties hereto of the Work required for the applicable Project; and (b) jointly performing all of the obligations of the "Contractor" under each such Contract actually entered into between the Joint Venture and the Owner; and

WHEREAS, the Parties hereto desire to set forth their rights and interests in the Joint Venture, and to set forth their duties and obligations under each Contract actually entered into between the Joint Venture and the Owner;

NOW, THEREFORE, in consideration of the premises, mutual promises and agreements herein set forth, the Parties hereby agree to constitute themselves as a Joint Venture for the purpose of: (a) submitting joint proposals to enter into each Contract with the Owner for the joint performance by the Parties hereto of the Work required for the applicable Project; and (b) jointly performing all of the obligations of the "Contractor" under each such Contract actually entered into between the Joint Venture and the Owner.

Nothing in this Agreement shall be construed as a limitation on the power or rights of either Party hereto to carry on its separate business for its sole benefit; except, however, that the Parties hereto shall cooperate with each other according to the terms and spirit hereof in the performance and completion of each such Contract entered into between the Joint Venture and the Owner pursuant to the terms of such Contract and the terms of this Agreement. The Parties hereby agree that each such joint proposal shall be submitted, and each such Contract actually entered into between the Joint Venture and the Owner shall be performed and completed, by the Parties hereto as a Joint Venture, subject to the following terms and conditions:"

2.    Paragraph 2(a) of the Agreement is hereby restated to read in its entirety as follows: "With respect to each Project, the Parties hereto agree to jointly prepare and submit, as the Joint Venture, a proposal to enter into a Contract to perform the Work required on such Project. The Parties hereto agree to exercise their commercially reasonable efforts, and to proceed reasonably and with due diligence, to agree as to the form, terms and conditions of the applicable proposal and Contract for each given Project. Should the Parties fail to unanimously agree as to the form, terms, or conditions of the applicable proposal or Contract for a given Project, the Joint Venture and this Agreement shall terminate only with respect to such Project, subject to the rights and obligations of the Parties accrued prior to such termination."

3.    Paragraph 2(e) of the Agreement is hereby restated to read in its entirety as follows: "With respect to each Project, if the proposal of the Joint Venture is accepted by the Owner, or if the Joint Venture is successful in negotiating a Contract with the Owner subsequent to the submission of the proposal, the Parties shall, in accordance with the direction of the Executive Committee, execute such Contract, and the Parties shall take such other steps and execute such other documents as may be required to make such Contract a legal and binding agreement between the Joint Venture and the Owner. If the Joint Venture's proposal for a given Project is not accepted by the Owner, or if the Joint Venture is not successful in negotiating the Contract for such Project with the Owner

within nine months of submission of the proposal, then this Agreement shall terminate only with respect to such Project, subject to the rights and obligations of the Parties accrued prior to such termination."

4. Notwithstanding anything to the contrary contained in Paragraph 2(e) of the Agreement, as modified by Paragraph 3 of this Second Amendment, the Parties confirm that the Joint Venture and this Agreement have not been terminated with respect to either the Diagnostic and Treatment Center Project (more particularly described in that certain Agreement between Owner and Contractor for Preconstruction Services dated April 17, 2000) or the Central Plant Project (more particularly described in that certain Agreement between Owner and Contractor for Preconstruction Services dated October 17, 2000) and that the Joint Venture and this Agreement continue in full force and effect with respect to both the Diagnostic and Treatment Center Project and the Central Plant Project.

5. With respect to the Diagnostic and Treatment Center Project and the Central Plant Project, the Parties hereby reconfirm that Peck/Jones, designated as the Managing Party of the Joint Venture pursuant to Paragraph 5 of the Agreement, was and is specifically authorized and empowered to enter into, execute and deliver any contract on behalf of the Joint Venture, including, but not limited to, any Contract with Cedars-Sinai Medical Center, a California nonprofit corporation, as the Owner, for the performance by the Joint Venture of the Work required by the Owner for such Projects. With respect to any contract for the performance by the Joint Venture of the Work required for any Project (other than the Diagnostic and Treatment Center Project and the Central Plant Project), the Parties agree that prior to the execution and delivery of any such contract by Peck/Jones, Peck/Jones shall give Obayashi the opportunity to review the terms and conditions of such contract and, if Obayashi does not object to such terms and conditions, Obayashi may then elect to: (a) together with Peck/Jones, execute such contract on behalf of the Joint Venture, or (b) give Peck/Jones independent written acceptance of such contract and authority to solely execute such contract on behalf of the Joint Venture.

6. Paragraph 15(a) of the Agreement is hereby restated to read in its entirety as follows: "This Agreement and the Joint Venture created hereby shall commence as of the day and date first written above and, unless extended by agreement of the Parties hereto, shall terminate with respect to a given Project upon the first to occur of the following: (i) The Owner's announcement that such Project has been canceled or that award of the Contract for such Project has been postponed indefinitely; (ii) an uncontested award of the Contract for such Project to another bidder; (iii) termination of the Contract for such Project and the cessation of all activities of the Joint Venture with respect to such Project; or (iv) the agreement of the Parties hereto to terminate this Agreement with respect to such Project."

7. Notwithstanding anything to the contrary contained in the Agreement, as modified by the First Amendment and this Second Amendment, the Parties hereto acknowledge and agree that they are jointly and severally liable for all of the obligations

of the Joint Venture, including, without limitation, the obligations of the Joint Venture under that certain Agreement between Owner and Contractor for Preconstruction Services dated April 17, 2000, with respect to the Diagnostic and Treatment Center Project, and that certain Agreement between Owner and Contractor for Preconstruction Services dated October 17, 2000, with respect to the Central Plant Project, and each and all other Contracts between the Joint Venture and the Owner.

8.     The Parties hereby reaffirm all of the terms and conditions of the Agreement, as modified by the First Amendment and this Second Amendment, and agree that the Agreement, as so modified, shall continue in full force and effect.

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound, have affixed their corporate seals next to the signatures of their officers duly authorized to act on their behalf.

**OBAYASHI CORPORATION, a Japanese corporation**

By:

Name:     SEIJI. AOYAGI

Title:     PARTNER

**PECK/JONES CONSTRUCTION CORPORATION, a California corporation**

By:

Name:     J. GREGORY JONES

Title:     PARTNER